## Penn Anthracite Collieries Company, Appellant, v. Hudson Coal Company.

Argued January 26, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Henry S. Drinker, Jr.,* with him *Thomas Reath, Jr.,* of *Drinker, Biddle & Reath,* and *M. J. Martin,* for appellant.

*W. J. Fitzgerald,* with him *Rudolph S. Houck, John P. Kelly* and *Thomas L. Ennis,* for appellee,

OPINION BY MR. JUSTICE LINN, March 22, 1937:

The appeal is from a declaratory judgment.[1] Petitioner, now appellant, asked for a declaration of rights and obligations under a contract of March 31, 1919, hereafter at times called the Surrender Agreement, made by parties now represented on the record by appellant and appellee. In its answer, appellee joined in asking such a declaration.

For a long period prior to the agreement, appellee's predecessor operated coal mines on a large acreage in Lackawanna County, the tracts composing it being referred to as Rockwell lands, the Von Storch, Dickson and Marvine collieries. The Rockwell lands, containing about 332 acres, were held and operated under mine leases.[2] Differences between lessor and lessee led to litigation in the Supreme Court of New York and resulted in judgment for appellant's predecessor. Other differences arose subsequently. The Surrender Agreement appears to have been intended to settle all these differences including discontinuance of the action in which judgment had been obtained. It provided for surrender, by appellee's to appellant's predecessor, of the Rockwell lands and leases under which they had been operated; to them appellant has succeeded. Each party contemplated thereafter mining its own coal.[3]

---

[1] Uniform Declaratory Judgments Act of June 18, 1923, P. L. 840, 12 PS section 831 et seq., amended April 25, 1935, P. L. 72, 12 PS section 836, and May 22, 1935, P. L. 228, 12 PS section 847.

[2] One of the leases was made in 1859, the other in 1861.

[3] The agreement contained the following recital: "Whereas, it is deemed expedient and desirable for both parties that methods should be devised by which the coal to be mined from openings upon the Rockwell Lands be as far as possible concentrated, and that methods be devised by which the coal to be mined by the parties of the first part and the Delaware Company may be conveniently and economically transported by the use by each of certain transportation lines over the property of the other, and that there be an interchange of facilities and a division of the costs of drainage and ventilation."

Prior to the agreement, pumps and drainage systems had been constructed and were in operation on the Rockwell lands and in the other mines. The maintenance of the pumps and drainage system required that a body of coal, referred to as the shaft pillar coal, be left in place to protect and support them. When the Rockwell lands were surrendered to appellant's predecessor, it was necessary to provide for the future drainage of the mines on the Rockwell lands and on the remaining lands of appellee's predecessor. They now differ concerning the interpretation of the Article dealing with this subject and have joined in this proceeding to resolve their differences. Article IV is as follows (we have numbered the paragraphs for convenient reference): "FOURTH: (1) The parties of the first part undertake to pump continuously and adequately the water accumulating upon and draining into the premises hereby released; the expense of such pumping of water, including renewals, additions, betterments and repairs to the machinery and all operating costs, to be borne in equal moieties by the two parties hereto.

(2) "The obligation of this covenant shall continue only until the permanent abandonment of operations on the properties of either of the parties affected thereby, and written notice of such abandonment to the other party. Should such termination of mining first occur upon the Rockwell Lands, the possession of and the right to operate the pumping plants then on the Rockwell Lands, may at its election pass to and be enjoyed by the Delaware Company [now appellee] upon its payment of one-half of the reasonable salvage value of said plants and, when so paid for, the Delaware Company shall have the right at its own cost and risk to maintain and operate the same.

(3) "After giving such notice of permanent abandonment, the parties of the first part shall have no right to resume mining on the Rockwell Lands unless they shall first repay to the Delaware Company any money thereto-

fore paid by the Delaware Company for said plants and one-half the cost of operation during such abandonment, nor unless they shall thereafter continue operation thereof as hereinabove provided.

(4) "In the event that the parties of the first part or their assigns or sub-tenants should, previous to giving notice of permanent abandonment, fail to carry out the provisions of this agreement with reference to pumping and ventilating, the Delaware Company shall have the right to enter upon the said lands in any of the veins and continue the operation of the pumping and ventilating facilities therein as specified in this agreement until the first parties resume operations and performance of this agreement. In such event the parties of the first part secondarily and their assignee primarily, shall be liable for one-half of the cost of such operation of pumping and ventilating facilities.

(5) "The pillar area about the Legitt's Creek shafts Nos. 2 and 3, as designated upon the map attached hereto, in each vein, which the Delaware Company considers necessary to be left in place upon the exhaustion of the coal from the Rockwell Lands in order properly to protect the shafts and pumping plant for use thereafter by the Delaware Company, as well as the surface area necessary for the use thereafter by the Delaware Company, shall be mutually agreed upon by the engineers of both parties, shall be shown upon the triplicate maps of each vein referred to in Article 'THIRD' hereof, and the surface area so required shall also be shown upon a map of the surface signed by the engineers of the parties hereto, made in triplicate originals, one to be delivered to each party hereto, and one to be filed with the Lackawanna Trust Co., as aforesaid.

(6) "All coal left in place to protect said pumping plants, shafts Nos. 2 and 3, and surface area required by the Delaware Company [now appellee], which said parties of the first part [appellant] or their successors, legal representatives, or assigns, could then otherwise

mine and remove and market shall be paid for by the Delaware Company at the reasonable market value thereof, when the parties of the first part shall have so far exhausted the coal on the Rockwell Lands that they desire to abandon mining therein, provided the Delaware Company elects at that time to continue the use of said facilities.

(7) "The present pumping plants in the collieries of the Delaware Company adjoining the Rockwell Lands, or other pumping plants of equal efficiency shall be maintained by it in at least the present state of efficiency, and shall be operated by the Delaware Company, so long as it continues mining on its own lands; and neither party shall divert or cause to be diverted water which now follows drainage or water courses leading to pumping plants located on its other lands to any drainage system or water course which would reach the pumps on the lands of the other party.

(8) "As and when new haulage and transportation ways are built to take coal from the Willard Parker Spencer and other tracts, the Delaware Company shall take adequate and efficient means to conduct the additional water resulting therefrom to the pumps of the colliery where the coal, thus transported and hauled, is prepared."

The agreement provides for the operation by each of the pumps on its property until permanent abandonment by either, the appellee to pay to appellant one-half the cost of maintaining and operating the pumps on the Rockwell lands until such abandonment by appellant. It contemplates the "permanent abandonment of operations" by either, and provides for notice to the other of such abandonment with the option in appellee, if appellant terminates, to take over the pumping plants on payment, as specified, with the right thereafter to maintain and operate. If appellant abandons, it may not resume mining without first reimbursing the appellee as specified; if appellant defaults before permanent aban-

donment, appellee is given the right to enter appellant's premises and to operate the pumps. They provided for the maintenance of sufficient pillar coal and surface to support the pumping plant and that appellee should pay for the same in the circumstances specified.

The parties operated under the agreement until March 15, 1933. December 9, 1932, appellant indicated to appellee that it desired to abandon mining in 1933 or 1934, and suggested that appellee might wish to make the necessary preparation to provide for the drainage of its own lands after appellant's abandonment. March 13, 1933, appellant by letter advised appellee, inter alia, that appellant "has so far exhausted the coal on the Rockwell Lands that it desires to abandon mining therein. Accordingly we give you this written notice that on March 15, 1933, mining will be terminated upon the Rockwell Lands and the operations on this property will be permanently abandoned.

"Following this termination of mining [appellant] will, for a period of 30 days thereafter, to wit, until April 15, 1933, continue to operate the pumping plants on the Rockwell Lands in accordance with the provisions of the Surrender Agreement, in order that you may have ample time within which to elect to continue the use of the pumping facilities on the Rockwell Lands. If you do elect to continue the use of said facilities, you will thereupon be obligated under the Surrender Agreement to pay to the [appellant] one-half of the reasonable salvage value of the pumping plants now on the Rockwell Lands and to purchase all coal left in place to protect said pumping plants, shafts and surface area which [appellant] could then otherwise mine and remove and market, this coal to be paid for by your Company at the reasonable market value thereof. If you do not elect to continue the use of said facilities, all pumping obligations of [appellant] under Article Fourth of the Surrender Agreement will be terminated, and [appellant] will proceed to mine and remove the shaft pil-

lar coal now reserved for the protection of said pumping plants.

"We are giving you this notice in accordance with Article Tenth of the Surrender Agreement which provides that in the case of any notice required to be given under the Surrender Agreement thirty days from date of mailing shall be considered a full, legal and reasonable notice. If we do not receive written notice of your election before April 15, 1933, we shall consider that you have elected not to acquire the pumping facilities and not to purchase the shaft pillar coal, and we shall proceed accordingly with our own program." On April 14, 1933, appellee notified appellant that it elected not to acquire the pumping equipment and would not then purchase the shaft pillar coal left in place since 1919 to support and protect that equipment. On March 15, 1933, appellant advised appellee that it had "this day terminated mining on the Rockwell Lands and the operations on this property have now been permanently abandoned."

The basic contentions now presented may be stated as follows: Appellant says that, having decided to abandon operations permanently and having given notice of that fact as required by the contract, it may, after appellee's election not to take over the pumps, resume operations as though the agreement had not contained the drainage provisions of Article Four. In reply, the appellee denies that appellant has permanently abandoned mining and asserts that this appears from appellant's expressed intention to resume mining, if permitted to do so, after having given the notice referred to.

The judgment of the learned court below was thus expressed: "We, therefore, conclude that under the Surrender Agreement the plaintiff [appellant] had no right to terminate mining under the Rockwell lands nor to mine and remove so much of the shaft pillar coal as remains accessible and discontinue pumping until permanent abandonment of mining by the plaintiff. That the

action of the plaintiff in discontinuing pumping result-
ing in damages to the defendant [appellee] for which
the defendant is entitled to compensation. · The defend-
ant is given leave to apply under Section 8 of the Act
of June 18, 1923, P. L. 840, for further relief and that
the costs of this proceeding shall be paid by the plain-
tiff.''

When the parties made the Surrender Agreement,
they intended that each should thereafter be free to
operate its mines until the coal was commercially ex-
hausted.   Each granted to the other certain rights in
the mines thereafter separately to be operated and each
assumed certain obligations, some absolute and some
contingent.   They did not agree that each must mine
until all the coal was removed. It was perhaps assumed,
though we do not imply it, that as long as coal could be
mined profitably, neither would wish to discontinue, but
that cessation of mining or permanent abandonment
would inevitably result from inability to mine at a
profit.   An important question was what should occur
if and when one of them wished to discontinue mining
before the other.   It was an important fact in the prob-
lem that pumping equipment of sufficient capacity to
drain the Rockwell mines and also part of appellee's
mines, was in existence on the Rockwell land.[4]   By
agreeing that this existing drainage system should be
operated by appellant (on whose lands it was) at the
joint expense of both, because it drained for both, the
appellee was saved the expense of building a new pump-

---

[4] Par. 7 of Article IV provides: "The present pumping plants in
the collieries of the Delaware Company adjoining the Rockwell
Lands, or other pumping plants of equal efficiency shall be main-
tained by it in at least the present state of efficiency, and shall be
operated by the Delaware Company, so long as it continues mining
on its own lands; and neither party shall divert or cause to be di-
verted water which now follows drainage or water courses leading
to pumping plants located on its other lands to any drainage sys-
tem or water course which would reach the pumps on the lands of
the other party."

ing plant on its lands and appellant was relieved of operating a plant of greater capacity than was needed for its mines alone; both were benefited. To provide summary relief if appellant should default, a right of entry on the Rockwell lands, with the right to operate the pumping equipment as specified, was vested in appellee (par. 3). They provided what should be done if either wished to give up mining, or, in the words of the contract, in case of "the permanent abandonment of operations" (par. 2) or "when the [appellant] shall have so far exhausted the coal on the Rockwell Lands that they desire to abandon mining therein" (par. 6).

In ascertaining the meaning of "permanent abandonment of operations," we are aided by other phrases in Article IV. Paragraph 2 has "such *termination* of mining." The words cannot have meant abandonment forever because appellant is given the right "to *resume* mining" (par. 3) on paying appellee specified expenditures made *"during* such abandonment"; but this provision to resume, considered with the others, does not support a right to abandon at will from time to time, as appellant seems to suggest; if mere temporary suspension from time to time had been contemplated the parties could have used the words clearly importing that meaning instead of the words "permanent abandonment" which are opposed to mere suspension. Paragraph 5 deals with the shaft pillar coal and creates what in argument was called a reserved area "necessary to be left in place upon the *exhaustion* of the coal from the Rockwell Lands." Paragraph 6 imposes on appellee, if it elects to take over the pumps after appellant's permanent abandonment, the obligation to pay for the pillar coal when appellant "shall have so far *exhausted the coal* on the Rockwell Lands that they desire to abandon mining therein." Paragraph 7 refers to appellee's obligation to operate pumps then on its lands "so long as it continues mining on its own lands." The order in which these paragraphs state the contract does not limit the

effect of the words in each, the meaning must be obtained by reading all together. It is not until paragraph 6 that the pillar coal necessary to support the pumping equipment is dealt with, and there it is provided that if appellee elects to continue using the facilities, it must buy the pillar coal. The notices given by appellant in March, 1933, had relation to this paragraph. The words "permanent abandonment of operations" (par. 2) and "such termination of mining" conditioning appellee's right to take the pumps, and the words that appellant "shall have so far exhausted the coal that they desire to abandon mining" (par. 6) refer to the same contingency, that is, what appellee must do to exercise its option to take the pumps when appellant abandons permanently. They agreed that appellee must then do three things: pay one-half the reasonable salvage value; maintain and operate the pumps; and purchase the pillar coal. They were providing for all future contingencies; were dealing as producers of a commodity presumably to be mined and marketed as long as commercially profitable. They considered that the mines of one party might be commercially exhausted before the mines of the other and provided what should be done in that event. Such a construction gives a unified effect to the whole of the fourth article and a consistent meaning to the various phrases used in providing for the discharge of their obligations.

If, therefore, appellant had "so far exhausted the coal on the Rockwell Lands that they desire to abandon mining therein" and, to effectuate that desire, gave the required notice of permanent abandonment, it acted within its rights created by the contract for that contingency. Having so given the notice, appellee was put to its election. Confronted with the notice, it made no protest that the contingency calling for election had not been presented; so far as its action indicated anything, it recognized appellant's claim of right to call on appellee to exercise its option and acted accordingly. It elected

not to take over the pumping equipment and the pillar coal, and, in doing so, exhausted its rights under that option.

We come then to what appellant may now do after the abandonment and notice described, and appellee's refusal to take the pumps. It is on this subject, as we understand the parties, that a declaration is desired.

In its petition for judgment, and in its replication to appellee's answer, appellant insists that it has permanently abandoned mining. We therefore consider that a fact in the case and deal with it accordingly. In argument appellee complains that while appellant said it had permanently abandoned, it did not mean what it said and did not intend to abandon. Appellant's intention is immaterial if it had the right to abandon; the contract clearly provides for that. The argument that there was no intention to abandon within the meaning of the contract is based on appellant's statement in the petition of what it desires to do in the future if the court shall now declare that it had the right then to do it. It appears that appellant desires to do two things, if lawful; it desires to mine the shaft pillar coal which could not be mined as long as it was required to support the pumping equipment; and it also desires to mine other coal not within the area reserved for the shaft pillar. The contract does not state specifically what shall be done with the pillar coal in that contingency but there can be no doubt about the implication. It is appellant's property.[5] The appellee had the option of purchasing it on specified conditions but declined. It re-jected the benefit of the pumps and thereafter had no interest in keeping in place the pillar coal which sup-ported the pumps. The pumps are not now required to drain appellee's mines; in fact, some of them have been removed by appellant. As pillars are usually mined

---

[5] In appellee's brief it is said that "It is common knowledge among mining men that a shaft pillar in itself contains several hundred thousand tons of coal."

last, the pillar coal cannot have been intended to be included within the words "exhausted the coal" (par. 6) or within the words "resume mining" (par. 3) because both necessarily dealt with the pillar coal as unmined for, unless it remained in place, there would have been no support for the shaft containing the pumps. Appellant's ownership of the pillar coal is now unrestricted and therefore includes the right to mine it. Until appellee elected not to buy it (par. 6) it was subject to an option which prevented appellant from mining it; once free of the option, there was nothing in the contract to prevent appellant from mining it.

But appellant also desires to mine other coal[6] outside of the shaft pillar area if permitted by the contract; this coal, as the petition avers, could not be mined economically or profitably so long as appellant was under the expense of operating the pumps in part for the benefit of appellee's mines. Appellant has shown no right to mine this coal which therefore remains subject to the terms of the contract. It cannot have been the intention of the parties that, at any time or from time to time, appellant, by stopping long enough to give thirty days' notice, could put appellee to an election to take over the pumps and, if appellee declined the offer, at any time, appellant could then cease pumping and nevertheless mine all the coal. We can find in the contract no support for the present right to mine this coal.

---

[6] Of this coal it is said in appellant's brief: ". . . which, while not commercially minable if the continued operation of the pumping plant were a condition necessary for its removal, may in the future become commercially minable if this is possible without the attendant operation of the pumps.

"In giving the termination notice of April 15, 1933, plaintiff did not assert the right thereafter to mine this additional coal, nor has it since mined a pound of it. All that plaintiff then asserted was its expectation of removing such coal, provided, in case of defendant's rejection of its option, it should be ultimately held that plaintiff had the legal right to do so without being thereby required to continue the operation of the pumping plants."

Appellant acted within its rights in filing this petition for a construction of the contract on the points concerning which the parties were at the moment engaged in controversy. The statute was intended to provide a method of determining rights and obligations in such circumstances without putting the parties to the necessity of possibly defaulting in their obligations, with resulting damage and subsequent litigation. Up to the present time appellee has not suffered any damage for which the appellant is made responsible by the contract even though loss resulted from lack of drainage. It is not denied that appellee had the opportunity of exercising any and all the options vested in it. If appellant has in fact[7] permanently abandoned, as it insists it has, and as we must therefore assume for present purposes, and if, as appears conceded, appellee has been deprived of no opportunity to exercise any available option, the appellee has not been injured by appellant because, so far as appears, appellant was within its rights in discontinuing the pumps.

We all agree, therefore, that the questions which we shall quote from appellant's brief, must be answered as follows:

"(1) Whether, after notice by plaintiff to defendant that it had so far exhausted the coal that it desired to abandon mining therein, and after refusal by defendant to exercise its option to take over the pumping plant, defendant had any right, under the Agreement, to require plaintiff to continue pumping?" The answer is no.

"(2) Whether plaintiff thereafter had the right to mine and remove the shaft pillar coal supporting the pumping plant, without reviving its obligation to continue pumping?" The answer is yes.

---

[7] Appellee's answer states: ". . . and avers that it is defendant's duty and obligation under the said Surrender Agreement to adequately and continuously pump the water accumulating upon and draining into said premises, until it has in fact permanently abandoned operations upon said premises."

"(3) Whether plaintiff may now proceed with the mining of any other coal remaining in the property without reviving such obligation to pump?" The answer is no.

The declaration appealed from is modified, and it is declared that, having permanently abandoned mining in the Rockwell lands and given notice of that fact to the appellee, which declined to exercise the option then available, the appellant (1) is not required to continue pumping for the purposes stated in the contract; (2) has the right to mine and remove the shaft pillar coal supporting the pumping plant; (3) may not proceed, so long as appellee shall not have permanently abandoned mining its land, with mining any other coal remaining on appellant's property without reviving the obligation to pump; (4) is not responsible in damages for the cessation of pumping as described above.

Each party shall pay its own costs.